**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNIVERSAL MEDITECH, INC. et al., | Case No. 1:24-cv-00528 JLT EPG |
| Plaintiffs, | ORDER GRANTING MOTIONS TO DISMISS WITH LEAVE TO AMEND IN PART |
| v. | |
| CITY OF REEDLEY, et al., | (Docs. 7, 9, 28) |
| Defendants. | |

Universal Meditech, Inc. (UMI) alleges the City of Reedley, California, the County of Fresno, and two federal agents obtained warrants to search its warehouse based on false or misleading affidavits. David He, UMI's representative, alleges federal agents used excessive force when they arrested him.  Defendants move to dismiss.  (Docs. 7, 9, 28.)  The Court agrees with Defendants that the complaint does not state a claim upon which relief can be granted under Rule 12(b)(6).

## ALLEGATIONS

UMI alleges it is a California corporation in good standing that has operated lawfully in Tulare and Fresno counties since 2015.  (Doc. 1 ¶ 4.)  It claims to have had authorization from the federal Food and Drug Administration to produce "diagnostic testing kits and other biologic medical devices."  (*Id.*)  Its ownership is based in China, and Mr. He, a Chinese national living in

1

California, was "at all times" the company's "authorized representative." (*Id.*)

The events that ultimately led to this litigation began in the fall of 2022, when UMI had an unspecified "business dispute" with its landlord in Fresno. (*Id.*) The company left Fresno and rented a warehouse in Reedley, where it began storing its assets temporarily until a new facility could be constructed. (*Id.*) UMI stresses in its complaint that the Reedley warehouse "was simply that, a warehouse" where its assets were stored. (*Id.*) The company "was not in active business," though it did "monitor and maintain" the assets in the warehouse, such as its "laboratory mice," "biological materials," and "medical devices." (*Id.*)

Soon after the company moved its assets into the warehouse, it came under investigation by local and federal agencies. (*Id.* ¶ 15.) UMI alleges the investigations were based on a "false narrative" that the company was performing dangerous work and that the warehouse was actually an "illegal Chinese lab" engaging in "bioterrorism." (*Id.* ¶¶ 22–23.) Although Mr. He and UMI "cooperated fully in the investigation"; although they made clear to the authorities that the company "was not in active business"; although the company always kept "its assets safely and securely stored"; and although "there was never any indication of any threat to public health and safety," the investigating agencies successfully pursued judicial warrants to inspect the warehouse, search and seize its contents, and ultimately to destroy UMI's property. (*See id.* ¶¶ 15–22.) Each of these warrants, UMI claims, was based on false allegations that the company "was operating an illegal laboratory, not merely storing its assets, and that it was engaging in hazardous and unlawful activities." (*Id.* ¶¶ 17–21.) The company lost "millions of dollars of property without lawful justification." (*Id.* ¶ 22.) It was reduced to "a worthless pariah." (*Id.* ¶ 23.)

Despite these setbacks, UMI and Mr. He continued to cooperate with investigators. (*Id.* ¶ 24.) In October 2023, Mr. He went to what he believed was a meeting with the local authorities. (*Id.*) The meeting was a pretext. (*Id.*) Federal officers took him into custody under "baseless federal criminal charges." (*Id.*) He is currently facing charges of wire fraud, conspiracy to commit wire fraud, distribution of adulterated and misbranded medical devices, and making false statements to officers of the federal Food and Drug Administration. *See* Case No.

1:23-cr-00219 DAD EPG Doc. 77 (first superseding indictment).[1] Mr. He alleges the agents "used unreasonable and excessive force" when they arrested him, "which resulted in his sustaining a severe head injury that continues to cause him serious health issues and pain." (*Id.*)

In this lawsuit, UMI alleges its property was unlawfully seized and destroyed without due process in violation of the Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution. (*Id.* ¶¶ 25–28.) It names four officers as defendants, each in an individual capacity: Jeremy Harrison, a building officer for the City of Reedley; Jessalyn Harper, a City code enforcement officer; Jerry Isaak, the City's Fire Chief; and Humberto Prado, the Assistant Public Health Director of the Fresno County Department of Public Health. (*Id.* ¶¶ 7–11). UMI asserts a similar claim under California law against the same four officers, the City of Reedley, and the County of Fresno. (*Id.* ¶¶ 29–33.) Finally, Mr. He and UMI allege the two federal officers—Special Agents Jeffrey Maurice and Maridehl Mather of the FDA's Office of Criminal Investigations—deprived them of their rights under the Fourth and Fifth Amendments. (*Id.* ¶¶ 34–37.)

Each defendant moves to dismiss the complaint. The City, Officers Harrison and Harper, and Chief Isaak (the City Defendants) move to dismiss for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Rule 12(b)(6). (Doc. 9.) The County and Assistant Director Prado (the County Defendants) move to dismiss for failure to state a claim. (Doc. 7.) Special Agents Maurice and Maridehl (the Federal Defendants) also move to dismiss for failure to state a claim. (Doc. 28.) UMI and Mr. He oppose these motions in part. They concede their state law claims must be dismissed (Doc. 20 at 17–18.), but they maintain that the Court has jurisdiction to hear their federal civil rights claims and that those claims are viable, (*see* Docs. 20 at 10–17; 29 at 9–14). Each group of Defendants has filed a reply, and the Court took the motions under submission without hearing oral arguments. (Docs. 15, 22, 23, 30, 31.)

## JURISDICTION

The City Defendants argue at the threshold that the Court lacks jurisdiction over this case

---

[1] The Court takes judicial notice of the filings in the criminal case but not the truth of any allegations within those filings. *See United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (permitting judicial notice of other proceedings that "have a direct relation to matters at issue." (citation omitted)).

at all under the *Rooker–Feldman* doctrine.  That doctrine bars federal district courts from hearing "a direct appeal from the final judgment of a state court." *Noel v. Hall*, 341 F.3d 1148, 1154 (2003).  The City Defendants argue this case is, for all practical purposes, an appeal of the state superior courts' decision to issue warrants and other orders related to UMI's warehouse.  (Doc. 9-1 at 7–8.)

Although "the *Rooker–Feldman* doctrine is exceedingly easy" to apply in a "routine" case, it can "become difficult—and, in practical reality, only comes into play as a contested issue— when a disappointed party seeks to take not a formal direct appeal, but rather its de facto equivalent, to a federal district court." *Noel*, 341 F.3d at 1155.  This has "led to a good deal of misunderstanding over the years, with lower federal courts struggling to evaluate their jurisdiction in cases involving parties who had previously litigated against each other in state court." *Miroth v. County of Trinity*, 136 F.4th 1141, 1146 (9th Cir. 2025).

In 2005, the Supreme Court "confined" the *Rooker–Feldman* doctrine "to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).  To underscore how limited the *Rooker–Feldman* doctrine is, the Supreme Court wrote that federal district courts have jurisdiction even when a plaintiff's federal claim "denies a legal conclusion that a state court has reached in a case to which he was a party." *Id.* at 293 (quoting *GASH Assocs. v. Rosemont*, 995 F.2d 726, 728 (7th Cir. 1993)).  The next year, the Supreme Court also made clear that the *Rooker–Feldman* doctrine does not bar actions filed in federal court "by nonparties to the earlier state-court judgment," even when those nonparties "could be considered in privity with a party to the judgment" for purposes of preclusion law. *Lance v. Dennis*, 546 U.S. 459, 466 (2006) (per curiam).

The Ninth Circuit has thus applied the *Rooker–Feldman* doctrine narrowly. *Miroth*, 136 F.4th at 1149.  The Circuit held in 2013, for example, that the district court had jurisdiction even though the plaintiffs "sought relief designed to remedy injuries suffered from a state court

judgment." *Bell v. City of Boise*, 709 F.3d 890, 897 (9th Cir. 2013). "[T]hey did not allege before the court that the state court committed legal error," and they did not "seek relief from the state court judgment itself." *Id.* Last year, the Ninth Circuit reiterated that the *Rooker–Feldman* doctrine does not bar a federal district court from hearing a claim based on the wrongs of an adverse party rather than by the state court itself. *Miroth*, 136 F.4th at 1151. A case is a "forbidden de facto appeal" only if the federal plaintiff "asserts as a legal wrong an allegedly erroneous decision by a state court, and seeks relief from a state court judgment based on that decision." *Id.* at 1155 (quoting *Noel*, 341 F.3d at 1164).

These decisions demonstrate that UMI's complaint against the City Defendants is not a "forbidden de facto appeal" of the state court's decisions about warrants and inspections. To begin, UMI was not a party in the state court warrant proceedings, which were actions in rem against the property. The City Defendants cannot demonstrate otherwise by showing UMI's property "caused the issues and necessitated the abatement action." (Doc. 23 at 2). Federal courts have jurisdiction even when the plaintiff was in privity with the state court litigant, as noted above. *Lance*, 546 U.S. at 466. That is true even if UMI and Mr. He "had ample opportunity in state court to raise the fraud allegations they raise here." *Miroth*, 136 F.4th at 1156.

This case also falls outside the definition of a "forbidden de facto appeal" because UMI does not allege the state courts erred. It faults the City Defendants and their allegedly false statements for the seizure and destruction of its property and reputation, not the courts. As noted, the *Rooker–Feldman* doctrine does not bar a federal district court from reviewing claims of wrongdoing by an adverse party, such as the City Defendants. *See id.* at 1151; *Noel*, 341 F.3d at 1163–64; *see also, e.g.*, *Benavidez v. County of San Diego*, 993 F.3d 1134, 1143–44 (9th Cir. 2021) (rejecting *Rooker–Feldman* argument in similar case of allegedly deceptive affidavits). For these reasons, the *Rooker–Feldman* doctrine does not come into force, and this Court has jurisdiction to hear UMI's claims against the City Defendants.

## ABSTENTION

Although federal courts have a "virtually unflagging" obligation to decide cases within

5

their jurisdiction, *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976), "[c]omity or abstention doctrines may, in various circumstances, permit or require the federal court to stay or dismiss the federal action in favor of the state-court litigation," *Exxon*, 544 U.S. at 292.  The City Defendants cite two such doctrines.  (Doc. 9-1 at 8–10.)

They rely first on the rule that has come to be known as "*Younger* abstention."  (Doc. 9-1 at 8–9 (citing *Younger v. Harris*, 401 U.S. 37 (1971).)  This rule reflects a "national policy forbidding federal courts to stay or enjoin pending state court proceedings except under special circumstances."  *Younger*, 401 U.S. at 41.  It is based on "a strong federal policy against federal-court interference with pending state judicial proceedings."  *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982).  "For civil cases, '*Younger* abstention is appropriate only when the state proceedings: (1) are ongoing, (2) are quasi-criminal enforcement actions or involve a state's interest in enforcing the orders and judgments of its courts, (3) implicate an important state interest, and (4) allow litigants to raise federal challenges." *Yelp Inc. v. Paxton*, 137 F.4th 944, 950–51 (9th Cir. 2025) (quoting *ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund*, 754 F.3d 754, 759 (9th Cir. 2014)).  If these threshold requirements are satisfied, then the court considers whether "the federal action would have the practical effect of enjoining the state proceedings" and whether any "exception to *Younger* applies."  *Id.* (quoting *ReadyLink*, 754 F.3d at 759).

The City Defendants do not claim the in rem warrant proceedings are ongoing, such that this Court must abstain under *Younger*.  They identify a different proceeding: a case initiated with a petition by the California Department of Public Health, in which that agency seeks to condemn and destroy medical test kits seized from UMI's warehouse.  (*See* Doc. 13 at 16–251); *see also Cal. Dept' Pub. Health v. Prestige Biotech, Inc.*, No. 24CECG02431 (Cal. Super. Ct. Fresno County filed June 5, 2024).[2]  The Department of Health's petition is based on provisions in the California Health and Safety Code that were passed as part of the state's Sherman Food, Drug, and Cosmetic Act.  (*See* Doc.13 at 21.)  These provisions instruct agents of the California

---

[2]  The Court takes judicial notice that the Health Department action was pending in the state court at the time this order was filed.  *See Robinson Rancheria Citizens Council*, 971 F.2d at 248.

Department of Public Health to embargo any medical devices that the agent "has probable cause to believe" are "adulterated, misbranded, or falsely advertised." Cal. Health & Safety Code § 111860. The law also instructs the Department of Public Health to commence proceedings in the superior court to condemn any adulterated, misbranded, and falsely advertised articles. *Id.* § 111880. A device is "misbranded if it was manufactured in [California] in an establishment" that was "not duly licensed" under the Sherman Act. *Id.* § 111425. A device is "adulterated" if, among other reasons, it was "held under conditions whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health." *Id.* § 111255. If a court "finds that an embargoed . . . device . . . is adulterated, misbranded, falsely advertised, or the sale of which is otherwise in violation of [the Sherman Act], the . . . device . . . shall, after entry of the judgment, be destroyed at the expense of the claimant or owner, under the supervision of an authorized agent of the department." *Id.* § 111885.

In the petition about UMI's test kits, the Department of Public Health alleges the kits were embargoed because they were "misbranded, adulterated, and manufactured without a license." (Doc. 13 at 17.) The Department alleges a company named Prestige Biotech, Inc., together with UMI, "manufactured, processed, packaged, and held the [embargoed kits] in violation of numerous Health and Safety Code provisions, including manufacturing without a license, holding devices in rodent infested conditions, failing to keep required records, and failing to provide the identity and strength to verify purity characteristics." (*Id.* at 23.)

It is likely that the state court petition satisfies at least some of the threshold requirements for the *Younger* abstention rule. As noted, the petition is pending, and UMI does not dispute the City Defendants' assertion that it is a "quasi-criminal enforcement action." (*See* Docs. 9-1 at 8; 20 at 13–14.) The Supreme Court has held that civil enforcement actions, disciplinary actions, and similar efforts to abate nuisances and impose sanctions for wrongful acts can justify abstention under *Younger*. *See Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 79 (2013) (collecting authority); *Citizens for Free Speech, LLC v. County of Alameda*, 953 F.3d 655, 657 (9th Cir. 2020) (same). Nor does UMI express any doubt that California has important interests in protecting its citizens' health and safety by preventing unlicensed or dangerous medical

7

devices from causing any harm. *Cf. Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996) (recognizing states' longstanding and traditional "latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons" (citations, quotation marks, and alterations omitted)). UMI similarly offers no reason to doubt that it could raise a "federal challenge" in response to the pending petition. (*See* Doc. 9-1 at 9 (citing Cal. Civ. P. Code § 1094.5).)

For these reasons, the Court assumes the Department of Health's pending petition satisfies the four threshold *Younger* requirements. Even so, the Court can abstain under *Younger* if moving forward in this case would "have the practical effect of enjoining the state proceedings." *ReadyLink*, 754 F.3d at 759. The City Defendants do not explain why they believe this action will have such a practical effect. UMI seeks damages, not an injunction or another type of equitable relief. (*See* Doc. 1 at 8–9.) Its allegations also relate to statements by local officials, not by agents of the California Department of Public Health, and the disputed statements are not about the adulteration or misbranding of medical devices. As summarized above, UMI alleges the City Defendants falsely stated "that UMI was operating an illegal laboratory, not merely storing its assets, and that it was engaging in hazardous and unlawful activities." (*Id.* at 5.) UMI also believes the property underlying its damages request in this case "has already been destroyed." (Doc. 20 at 13.) It disclaims any intent "to take control over physical assets already under control of a state court." (*Id.*) For all practical purposes, it appears that this case could continue alongside the state court petition without causing any disruptions. If UMI ultimately shows it is entitled to damages, that award could be paid without disturbing the state court proceedings, assuming they are still pending. The Court declines to abstain under *Younger*.

The second abstention doctrine raised in the City Defendants' motion is based on the Supreme Court's decisions in *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). (Doc. 9–10.) The *Burford* rule "is concerned with protecting complex state administrative processes from undue federal interference." *Peridot Tree, Inc. v. City of Sacramento*, 94 F.4th 916, 929 (9th Cir. 2024) (quoting *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 362 (1989)). It applies when the district court is "sitting in equity." *Id.* at 930. If "timely and adequate state-

8

court review is available," then the district court should abstain when (1) "there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar," and (2) "the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *New Orleans Public Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989) (citations and quotation marks omitted). The Ninth Circuit has further limited *Burford* abstention to situations in which "the state has concentrated suits involving the local issue in a particular court," "the federal issues are not easily separable from complicated state law issues with which the state court may have special competence," and "federal review might disrupt state efforts to establish a coherent policy." *Peridot Tree*, 94 F.4th at 930 (quoting *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 671 (9th Cir. 2004)).

California has not concentrated petitions about embargoed medical devices in any particular state court. Nor are the issues here—whether officers made false or misleading statements about UMI's business and its Reedley warehouse—difficult to separate from the issues in the pending Health Department's petition. The City Defendants have not demonstrated that those issues are "complicated," nor that the state court has "special competence" to resolve them, and most fundamentally, this Court is not sitting in equity. As noted, UMI seeks damages and believes the property in question has already been destroyed. Continuing with this litigation is unlikely to disrupt California's efforts to keep "adulterated, misbranded, and falsely advertised" medical devices off the market.

In sum, the Court will not abstain from exercising its jurisdiction under the *Younger* or *Burford* doctrines and moves now to the merits of the Defendants' pending motions, starting with the motions by the City and County Defendants and the claims against them.

## CITY AND COUNTY DEFENDANTS

### I.    Legal Standards

Federal Rule of Civil Procedure 12 permits motions to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss

under this rule, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Federal Rules ordinarily require only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A plaintiff alleging fraud, however, "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "Particularity" means, in this context, that the plaintiff must allege the "who, what, when, where, and how of the misconduct charged, including what is false or misleading about the statement, and why it is false." *Benavidez*, 993 F.3d at 1145 (quoting *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016)). The Court's task in response to a Rule 12(b)(6) motion is a "context-specific" exercise that draws on "judicial experience and common sense." *Iqbal*, 556 U.S. at 678. at 679. The Court must make "all reasonable inferences in favor of the nonmoving party." *Boquist v. Courtney*, 32 F.4th 764, 773 (9th Cir. 2022) (quoting *Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014)).

UMI has conceded its state law claim is not viable under this standard. The court dismisses that claim without leave to amend. In UMI's remaining claim against the City and County Defendants, it contends the individual officers made "false and misleading" statements in their search warrant affidavits. (Doc. 1 ¶¶ 16–20, 23, 25–28.) It alleges they falsely claimed "that UMI was operating an illegal laboratory, not merely storing its assets, and that it was engaging in hazardous and unlawful activities." (*Id.* ¶¶16–20.) UMI does not clarify what it means by "hazardous and unlawful activities," but elsewhere in the complaint, it alleges that it "was not in active business" and that if "there was any activity in the warehouse, it was only to monitor and maintain its valuable assets." (*Id.* ¶ 4, 15.) The Court thus interprets UMI's complaint as alleging that the officers falsely stated or implied that UMI was operating an illegal or hazardous laboratory when in reality it was only storing, monitoring, and maintaining its assets in a warehouse.

This claim arises under the Fourth Amendment, which protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and

10

seizures." U.S. Const. amend. IV.  This protection applies not only to police officers who wish to search a home for evidence of a crime, but also to "health, fire, or building inspectors" who come to a "warehouse" with the intent "to locate and abate a suspected public nuisance." *Michigan v. Tyler*, 436 U.S. 499, 504 (1978).  But the Fourth Amendment "does not prohibit all unwelcome intrusions on private property." *Caniglia v. Strom*, 593 U.S. 194, 198 (2021).  Officials can conduct searches and make seizures "pursuant to a valid warrant." *Id.*  This is also true in the case of "entries onto private land to search for and abate suspected nuisances." *Conner v. City of Santa Ana*, 897 F.2d 1487, 1490 (9th Cir. 1990).

Because a warrant must be "valid," officers may not conduct searches or make seizures under "ill-begotten or otherwise invalid" warrants. *Bravo v. City of Santa Maria*, 665 F.3d 1076, 1083 (9th Cir. 2011).  So officers may not rely on deception to obtain warrants. *KRL v. Moore*, 384 F.3d 1105, 1117 (9th Cir. 2004) (citing *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978)).  Nor may officers omit information from their affidavits if doing so will cause those affidavit to be materially misleading when "considered as a whole." *Scanlon v. County of Los Angeles*, 92 F.4th 781, 799 (9th Cir. 2024).  But "negligence or good faith mistakes will not invalidate an affidavit which on its face establishes probable cause." *Blight v. City of Manteca*, 944 F.3d 1061, 1069 (9th Cir. 2019) (quotation marks and citation omitted).  So in sum, to withstand the City and County Defendants' motion under Rule 12(b)(6), UMI must allege that the defendant officers made "a misrepresentation or omission," either "deliberately or with a reckless disregard for the truth," and that this misrepresentation or omission was "material to the judicial decision." *Benavidez*, 993 F.3d at 1147.  And under Rule 9(b), UMI must allege "the who, what, when, and where of the judicial deception." *Id.* at 1148.

The City and County Defendants argue any false or misleading statements in the affidavits were not material.  (*See* Docs. 7 at 11–16; 9-1 at 10–11.)  "A misrepresentation or omission is material if a court would have declined to issue the order had the defendant been truthful." *Scanlon*, 92 F.4th at 799 (quoting *David v. Kaulukukui*, 38 F.4th 792, 801 (9th Cir. 2022)).  Conversely, if the affidavit would have established probable cause "once corrected and supplemented," then there is "no constitutional error." *Bravo*, 665 F.3d at 1083 (quotation marks

11

and citations omitted).

The Court's decision here thus depends on the definition of the phrase "probable cause" within the Fourth Amendment.  In a criminal case, there is "probable cause" when, "given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (quotation marks omitted).  By contrast, in cases about "administrative searches," the Supreme Court has "explicitly lowered the probable cause test from the standard applied in criminal cases." *Columbia Basin Apartment Ass'n v. City of Pasco*, 268 F.3d 791, 803 (9th Cir. 2001) (citing *Camara v. Mun. Ct. of the City & Cty. of S.F.*, 387 U.S. 523 (1967)); *see also, e.g.*, *O'Connor v. Ortega*, 480 U.S. 709, 724 (1987) (rejecting criminal probable cause requirement for public employers' searches of employees' private workplaces); *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 320–21 (1978) (same for inspections under the Occupational Health and Safety Act of 1970).  "But reasonableness is still the ultimate standard.  If a valid public interest justifies the intrusion contemplated, then there is probable cause to issue a suitably restricted search warrant." *Camara*, 387 U.S. at 539.  The County defendants argue the affidavits in this case related to administrative searches and seizures, not criminal investigations or prosecutions, and UMI does not contend otherwise.  (*See* Docs. 7 at 11; 20 at 16–17.)  The Court's task is therefore to determine whether the disputed affidavits would have established probable cause under the lower "reasonableness" standard if the officers had made clear within them that UMI was only storing, monitoring, and maintaining its assets in the Reedley warehouse.

## II.    Discussion

This inquiry is somewhat complicated by the fact that UMI did not include the disputed affidavits in its complaint.  Nor did it quote them.  Courts may ordinarily consider only the complaint and its allegations when deciding whether a complaint must be dismissed under Rule 12(b)(6). *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).  If the court takes other matters into consideration, then "the 12(b)(6) motion converts into a motion for summary judgment under Rule 56." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir.

12

2018) (quoting Fed. R. Civ. P. 12(d)).  But there are two exceptions to this rule, and these exceptions permit the court to review the affidavits themselves.

First, the "incorporation-by-reference" rule "is a judicially created doctrine that treats certain documents as though they are part of the complaint itself."  *Id.* at 1002.  It "prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims."  *Id.*  This rule permits this Court to consider a document if "the plaintiff's claim depends on [its] contents," if "the defendant attaches the document to its motion to dismiss," and if "the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint."  *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).  UMI's claims against the City and County Defendants depend on its allegations about the officers' affidavits and the contents of those affidavits.  The City and County Defendants have also attached copies of their affidavits to their motion.  (*See* Docs. 10–14.)  Although UMI claims some assertions within those documents are false, it does not dispute that they are authentic copies of the allegedly false or misleading affidavits.  (*See* Doc. 20 at 15.)  The Court may therefore consider the affidavits under the incorporation doctrine.

Second, Federal Rule of Evidence 201 permits this Court to take "judicial notice" a fact if it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(1)–(2).  In addition, "[a] court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment."  *Lee*, 250 F.3d at 689 (citation and quotation marks omitted).  Courts thus commonly take judicial notice of the contents of publicly available search warrants in cases like this one.  *See, e.g.*, *Ferguson v. Cal. Dep't of Just.*, No. 16-06627, 2017 WL 2851195, at *1 (N.D. Cal. July 4, 2017); *Bennett v. Cnty. of Shasta*, No. 15-1764, 2016 WL 3743151, at *1 n.1 (E.D. Cal. July 13, 2016).  UMI does not dispute that the affidavits and warrants are public court records; it alleges expressly, in fact, that they are.  (Doc. 1 ¶ 23.)  And although UMI argues correctly that the Court must not assume the assertions within the officers' affidavits are true and cannot resolve factual disputes, it does not dispute that the Court may take judicial notice that the officers who

13

signed the affidavits made the statements within them.  Nor does UMI dispute that the related state court filings accurately reflect what was filed and what the state court ordered.  The Court thus concludes that it may consider the state court records attached to the City Defendants' request for judicial notice without converting the pending motion into a motion for summary judgment.  (*See* Docs. 10–14.)

The text of the disputed affidavits leaves no question but that there would have been "probable cause" for searches and seizures under the Fourth Amendment, even if the officers had made clear to the state court that UMI was merely storing, monitoring, and maintaining assets in the warehouse.  The Court begins by summarizing what remains in the affidavits after all of the allegedly false and misleading claims about the warehouse are removed.  To be clear, the court does not assume the statements summarized below are accurate or true, but rather only that the state court had these statements at its disposal when it was deciding whether to issue the warrants in question.

The first affidavit cited in UMI's complaint was sworn by defendant Harrison, a city building officer, on March 10, 2023.  (*See* Docs. 1 ¶ 15; 10-1 at 9–12.)  According to that affidavit, he visited the Reedley warehouse with several other officers the week before.  (Doc. 10-1 at 10.)  They "witnessed multiple building and municipal code violations throughout the portions of the facility that were not locked."  (*Id.*)  They saw "multiple electrical circuits" had been "added to the facility that were not permitted or inspected."  (*Id.*)  "There was a garden hose running [from] a service sink [to a] locked portion of the building through a hole in the rear wall."  (*Id.*)  There was a hole in a door "to allow for ventilation from unknown equipment," and it smelled like "rodent excrement."  (*Id.*)  From what Harrison could see, there were "various chemicals" in the building as well.  (*Id.* at 11.)

The Superior Court issued an inspection warrant based on Harrison's affidavit a few days later.  (*Id.* at 23.)  It authorized City officials to inspect "the interior and exterior of the industrial warehouse, structures, and storage facilities, including any portions of those facilities that may be locked located on the Property for any existing violations of the Reedley Municipal Code, the California Building Code, and the California Health and Safety Code."  (*Id.* at 21.)  The court's

order permitted officers to use "reasonable force" to secure the property, restrain occupants, and conduct the inspection. (*Id.*) The court also permitted officers to collect samples of substances found on the property, such as any suspected hazardous waste and soil and liquid samples. (*Id.* at 22) Officers were required to give twenty-four hours' notice of the warrant, to complete the search between March 10 and 24, 2023, and to execute the search between 8 a.m. and 6 p.m., regardless of whether any responsible parties, owners, or occupants were present. (*Id.*)

According to the warrant return, Harrison and other officers served the warrant on March 16, 2023 at approximately 11 a.m. (Docs. 10-1 at 27; *see also* 10-2 at 10.) They found "multiple building and safety violations." (Doc. 10-1 at 27.) Officers from the California Department of Public Health "documented embargoed items" during this search, as discussed in the section above, i.e., the allegedly misbranded and adulterated medical testing kits. (*See id.*) Officers from the California Department of Toxic Substance Control also "identified a room with multiple vessels of liquid, apparatus, and other items that were potentially unsafe," which the officers did not enter. (*Id.*) Finally, officers also "found a room housing hundreds of laboratory mice." (Doc. 10-2 at 11.) There was a person at the warehouse during the search. (*Id.*) That person told the officers "that these mice were genetically engineered to catch and carry the COVID-19 virus." (*Id.*)

The second disputed affidavit was sworn by defendant Harper, a City code enforcement officer, a few days later, on March 29, 2023. (*See* Docs. 1 ¶ 17; 10-2 at 9–12.) In this affidavit, Harper reported that she had exchanged emails with a person named Xiuquin Yao, who claimed responsibility for the warehouse. (Doc. 10-2 at 11.) Harper asked if Yao "could provide any licenses of certifications permitting the experiments and breeding of these mice" the officers had found in the warehouse. (*Id.*) Yao "never provided any certifications or licenses from any state or federal agency that permitted the activities being conducted on the property." (*Id.*) Nor did Yao give Harper "a plan to care for the mice, or where the mice would be moved." (*Id.*) Yao gave Harper the names of people "who were supposed to provide food and water to the mice," but these people either did not return Harper's calls or told her they were not actually the company's employees. (*Id.*) A veterinarian inspected the property at the City's request. (Doc. 10-2 at 11.)

She said "the mice [were] being housed in conditions that are far outside of all animal welfare regulations and standards of care," such as overcrowding in cages and constant lighting. (*Id.*)

The superior court issued a warrant on April 4, 2023. (Doc. 11 at 4.) It authorized officers to enter the property between April 6 and 20, 2023 between 8 a.m. and 6 p.m. to seize "all mice being kept on the Property so that they may be humanely euthanized." (*Id.*) Officers posted a notice of the warrant on the property on April 10, 2023 and executed it on April 12, 2023, at approximately 12:45 p.m. (*Id.* at 8.) They found "a large number of dead mice in the cages, and many injuries and deformities." (*Id.*) There was no running water, and the cages were severely filthy. (*Id.*) A veterinarian recommended the mice be euthanized because they were suffering and adequate housing and care were not possible. (*Id.*)

The third disputed affidavit was sworn by defendant Prado, the Assistant Director of the County of Fresno Department of Public Health, on June 15, 2023. (Docs. 1 ¶ 18; 11 at 48.) He stated that Public Health staff had attempted unsuccessfully to contact the warehouse operators since December 2022. (*Id.*) He also described in more detail what officers had found when they executed the first warrant a few months before: "embargoed medical devices, e.g. COVID tests and pregnancy tests" (*id.* at 49); "blood, tissue and other bodily fluid samples and serums" (*id.*); "thousands of vials of unlabeled fluids and suspected biological material" (*id.*); "[v]arious laboratory equipment," including "a biological safety cabinet and centrifuge" (*id.*); and refrigerators and freezers, including two "ultralow temperature freezer units" capable of maintaining temperatures of between negative 60 and 80 Celsius. (*id.*) Prado stated on information and belief "that since December 2022, UMI and [another company, i.e., Prestige Biotech, Inc.] were disposing of deceased laboratory mice, considered to be medical waste, without the use of a licensed medical waste hauler." (*Id.* at 50.)

Prado went on to explain in his affidavit that Fresno County Public Health staff "were concerned how the biological materials, viruses, bacterial agents, and other infectious agents may react if the refrigerators and freezers failed and these infectious agents reached an ambient temperature." (*Id.*) Accordingly, they inspected the property again on April 21, 2023. (*Id.* at 52.) In this inspection they "observed biologicals stored and kept in hazardous and non-

16

compliant conditions, the presence of multiple infectious agents (confirmed by [representatives of the federal Centers for Disease Control and Prevention])." (*Id.*)  They also found "32 refrigerators and freezers" and saw that some "had either stopped functioning or were failing due to an inadequate power supply," a result of the unpermitted electrical additions that code enforcement staff had previously observed.  (*Id.*)

Prado also referred to a letter from defendant Isaak, the City Fire Chief, "regarding the fire danger and explosion hazards created by the corrosive, toxic, and highly flammable chemicals stored within the warehouse on the Property." (*Id.* at 53, 69.)  In Isaak's opinion, the combination of "drums of chemicals" and "hazardous (unpermitted) electrical" infrastructure on the warehouse property created "a huge concern for a fire to occur." (*Id.* at 69.)  The danger of chemical inhalation and explosions would prevent firefighters from entering the facility if a fire broke out. (*Id.*)  Isaak "stressed the need for a plan to have an evacuation zone of one city block around the warehouse on the Property." (*Id.* at 53.)  This would have been no trivial task.  "The proposed evacuation zone would include the City of Reedley Police Department, City Hall, the Kings Canyon Unified District main office, and approximately 12 residential homes." (*Id.*)

Prado also explained in his affidavit how officers from the California Department of Public Health had inspected the property on May 1, 2023. (*Id.* at 53.)  According to Prado's summary of that inspection, "CDPH staff observed containers labeled as serum or plasma (of unknown origin) and/or with the name of an infectious agent." (*Id.*)  Many other containers were unlabeled. (*Id.*)  They "appeared to contain blood, or a blood product, such as serum, or other bodily fluids." (*Id.*)  Officers also found "numerous vials of pharmaceuticals" and "what appeared to be a biohazardous waste container shrink wrapped to a pallet." (*Id.* at 54.)  Similarly, Prado wrote that officers of the federal CDC, FDA, and FBI had inspected the facility on May 2, 3, and 4, 2023. (*Id.* at 55.)  They found "thousands of vials that had unclear labeling, coded labeling, or no identification" along with "evidence that the entity labeled items" were "dangerous." (*Id.*)  The CDC officers found "at least 20 potentially infectious agents" including *Chlamydia trachomatis*, *E. coli*, *Mycobacterium tuberculosis*, *Mycoplasma pneumoniae* and general *Mycoplasma* species, *Neisseria meningitidis*, *Nostoc* species, *Sphingobacterium*

*heparinum*, *Streptococcus pneumoniae* and *Streptococcus* species, *Toxoplasma gondii*, Hepatitis B virus, Hepatitis C virus, Dengue virus, Human Immunodeficiency Virus 1 and 2, Human Herpes virus 1 (Herpes simplex virus), Human Herpes virus 5 (Human Cytomegalovirus), Respiratory Syncytial virus, Rubella virus, Serve Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2), and Malaria.  (*Id.* at 55–56, 80.)  Some of these specimens appeared, however, to be "diagnostic," rather than "isolates or culture."  (*Id.* at 80.)

Prado exchanged emails about the facility with Mr. He, who claimed to be authorized to speak on behalf of UMI.  (*Id.* at 58.)  Mr. He did not provide satisfactory documentation of that authority.  (*Id.*)  Mr. He also failed to propose an adequate plan to make the warehouse safe; he denied, in fact, that there were any infectious agents in the warehouse at all.  (*Id.* at 58–59.)  In Prado's mind, this "raise[d] serious concerns with the lack of safety protocols" and suggested the warehouse posed "a serious threat to public health and safety."  (*Id.*)

Based on the inspections and his communications with Mr. He, Prado was concerned that "[t]he continued presence of biological material, medical waste, and infectious agents" at the facility posed "a serious and substantial risk to public health and safety."  (*Id.* at 62.)  "For example," he wrote, "a mosquito could feed on a sample of tissue or blood exposed to Malaria stored on the Property and become a vector to spread Malaria."  (*Id.* at 62–63.)  "Alternatively, the documented infestation of rats and other pests on the Property could become vectors if exposed to any one of the numerous infectious agents that, as a matter of law, cause or significantly contributes to the cause of morbidity or mortality of human beings."  (*Id.* at 63.)  In Prado's opinion, "the history of the poor maintenance of the Property and the unlawful storage and handling of biological materials" meant that "abatement by destruction of all biological material, medical waste and infectious agents [was] the reasonable and prudent course of action to prevent the spread of the infectious and communicable diseases found on the Property."  (*Id.*)

The Superior Court issued an abatement warrant on June 23, 2023.  (Doc. 12 at 4.)  It authorized Fresno County Public Health staff to enter the warehouse and "dispose of all biological material," including waste, "all infectious agent," and "all containers, vials, boxes, bags, laboratory equipment and other storage devices that store or have been contaminated by

18

biological material, medical waste and/or infectious agents." (*Id.* at 3.)  Public Health officers executed the warrant on July 5, 6, and 7, 2023.  (Doc. 13 at 2–4.)

The final two disputed affidavits were sworn by defendants Izaak (the Fire Chief) and Harper (the code inspection officer) on July 18, 2023, in support of the City's application for a warrant to enter the warehouse and remove any other dangerous, abandoned, and embargoed property that remained.  (*See* Docs. 1 ¶ 19; 12 at 16–20, 49–54.).  Izaak stated that he had found garbage, contaminated materials, violations of state building codes, hazardous liquids, poor maintenance, unsafe electrical wiring, "potentially explosive and flammable substances," inadequate ventilation equipment, an infestation of mice and other rodents, and a collapsing roof. (*Id.* at 18–19.)  Harper stated in her affidavit that the officers' past inspections had "resulted in further concern for the structural integrity of the building, with visible signs of disrepair, deterioration, and neglect." (*Id.* at 52.)  The large numbers of stored medical devices, components, and machines were also blocking the way into and out of the building.  (*Id.* at 52– 53.)  The Superior Court issued the requested warrant on July 26, 2023.  (Doc. 13 at 10.)  It authorized the officers to enter the warehouse between 8 a.m. and 6 p.m. on any day within the next fourteen days and to remove any improperly stored hazardous materials, chemicals, medical waste, and similar materials; to remove any abandoned components, appliances, furniture and similar items that pose a risk of "inadequate" or "obstructed" egress; to remove unpermitted electrical work; and to have a structural engineer assess the property to confirm its structural integrity.  (*Id.* at 11.)

In each instance, the officers' affidavits established probable cause for searches and seizures at the Reedley warehouse under a variety of laws and regulations, even without any claims about illegal laboratory operations or other business activity.  The defendants' motions and filings before the superior court offer five examples of categories of laws and regulations that supported the challenged warrants under the Fourth Amendment standard:

- The California Code of Civil Procedure permits a state superior court to issue an inspection warrant for suspected violations of "state or local law or regulations relating to building, fire, safety, plumbing, electrical, health, labor, or zoning."

19

Cal. Civ. P. Code § 1822.50.  Inspection warrants are "issued upon cause," *id.* § 1822.51, which "shall be deemed to exist if . . . there is reason to believe that a condition of nonconformity exists with respect to the particular place, dwelling, structure, premises, or vehicle," *id.* § 1822.52.  Federal and state appellate courts have not distinguished inspection from abatement warrants under these provisions. *See Connor*, 897 F.2d at 1490–91 (citing *Gleaves v. Waters*, 175 Cal. App. 3d 413 (1985)).

- California law defines "[a]nything which is injurious to health" as a nuisance.  Cal. Civ. Code § 3479.  A "public nuisance" is a nuisance that "affects at the same time an entire community or neighborhood, or any considerable number of persons." *Id.* § 3480.  The law authorizes an abatement as a remedy for a public nuisance. *Id.* § 3491.  The City of Reedley also authorizes its officers to abate nuisances if they obtain an abatement warrant. *See, e.g.*, City of Reedley Mun. Code § 1-12-1(D).

- The state Health and Safety Code regulates the generation, transportation, and disposal of "medical waste." *See, e.g.*, Cal. Health & Safety Code § 117918 (treatment); *id.* § 117928 (storage); *id.* § 18025 (hauling).  "Medical waste" includes "waste generated in research pertaining to the production or testing of microbiologicals" and "in research using human or animal pathogens," among other things.  Cal. Health & Safety Code § 117690(a).  Medical waste also includes "biohazardous waste," i.e., waste that is "suspected of containing a highly communicable disease"; "recognizable human blood, fluid human blood products, contains, or equipment containing human blood that is fluid"; "cultures and stocks of infectious agents from research"; and "wastes from the production of bacteria, viruses, spores, discarded live and attenuated vaccines used in human health care or research," and other things. *Id.* § 117690(b)(1)(A)–(C).  Serious violations of these provisions can be felonies punishable by imprisonment; unknowing violations may be infractions only, punishable by a fine of up to $1,000. *See id.*

20

§ 118340(b)–(d).

- The Reedley Municipal Code makes it unlawful to deprive animals of adequate food, drink, and shelter and to keep animals "in a foul, offensive, obnoxious, filthy, or unsanitary condition."  City of Reedley Mun. Code § 5-3-8(C), (H). California law likewise makes it a crime to keep animals "in any building . . . without proper care and attention."  Cal. Pen. Code § 597.1(a)(1).

- State law gives local Health Officers authority to take "measures as may be necessary" to prevent the spread of any "infectious or communicable disease" that they know or have "reason to believe" is within their jurisdiction.  Cal. Health & Safety Code § 120175.

Under these provisions, it would have been reasonable for the Superior Court to permit the inspections of the Reedley warehouse based on the claims in Harrison's affidavit.  He reported unpermitted and dangerous electrical and plumbing work, poor ventilation, and chemicals would remain.

It was reasonable also for the Superior Court to rely on Harper's affidavit to conclude that mice were being kept in the warehouse in unsanitary conditions and without adequate care.  As noted, she described the conditions of the warehouse, her unsuccessful attempts to communicate with the warehouse's tenants and the mice caregivers, and the opinions of a veterinarian.

Prado's affidavit likewise supported an abatement warrant.  He included extensive details about what local, state, and federal investigators found in the warehouse, as summarized above: embargoed medical devices, blood and human tissue samples, unlabeled fluids, ultra-low temperature freezers at risk of failure, toxic chemicals, vials of pharmaceuticals, biohazardous waste, and at least twenty potentially infectious agents.  The unpermitted electrical additions within the warehouse increased the risk of fire.  If a fire did break out, the suspected chemicals and the risk of an explosion would prevent firefighters from entering the building.  In the opinion of the fire chief, a fire would therefore have necessitated the evacuation of the police department, city hall, school district office, and about a dozen homes.  And Mr. He, who claimed to be an authorized representative of the warehouse's tenants, either did not know or lied about the

21

presence of the infectious agents in the building, suggesting that the company was unlikely to take prompt and adequate actions on its own.

The same is true of the warrants Harper and Isaak filed in support of the City's application for an abatement warrant.  Their affidavits explained how garbage, contaminated materials, hazardous liquids, unsafe electrical wiring, inadequate ventilation, rodents, a collapsing roof, potentially explosive and flammable substances, and poor maintenance had obstructed the building's exits and made it generally unsafe.

The City and County Defendants' motions to dismiss are thus granted.  UMI requests leave to amend its federal civil rights claims against the City and County.  (Doc. 29 at 14.) Although the contents of the disputed affidavits and state court filings is subject to no reasonable dispute, the Court cannot exclude the possibility that UMI could make new or more specific allegations about other statements in those affidavits.  Amendments like these—if possible to make in compliance with Federal Rule of Civil Procedure 11—would not necessarily be an exercise in futility.  This case is also in its early stages from a procedural vantage point, and the Court perceives no bad faith, prejudice, or undue delay in UMI's request for leave to amend. UMI is therefore granted leave to amend its first claim.  *See, e.g.*, *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006) (summarizing applicable factors and emphasizing that "Rule 15(a) is very liberal and leave to amend should be freely given when justice so requires." (citation and quotation marks omitted)).

## FEDERAL DEFENDANTS

UMI and Mr. He assert constitutional claims against the federal officers under *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971).  (Doc. 1 ¶¶ 34–37.)  UMI alleges Special Agent Maurice deprived the company of its right to be free from unreasonable searches and seizures in violation of the Fourth and Fifth Amendments.  UMI alleges Special Agent Maurice, like the City and County Defendants, falsely or misleadingly stated that "UMI was operating a laboratory, not merely storing its assets, and that it was engaging in hazardous and unlawful activities."  (*Id.* ¶¶ 21, 35.)  Mr. He alleges for his part that the two special agents used excessive force during his arrest in violation of his rights under the Fourth Amendment.  (*Id.*

22

¶¶ 24, 35.)  The Federal Defendants move to dismiss these claims under Rule 12(b)(6).  (Doc. 28-1 at 5.)  They argue UMI and Mr. He cannot make out a cognizable legal claim under *Bivens*. (*See id.*)

In *Bivens*, the Court held that the plaintiff had "a cause of action under the Fourth Amendment" to seek damages from agents from the federal Bureau of Narcotics.  403 U.S. at 397.  He alleged that they had entered his apartment, arrested him, "manacled" him in front of his wife and children, and "threatened to arrest the entire family."  *Id.* at 390.  "Over the following decade, the Court twice again fashioned new causes of action under the Constitution— first, for a former congressional staffer's Fifth Amendment sex-discrimination claim, and second, for a federal prisoner's inadequate-care claim under the Eighth Amendment."  *Egbert v. Boule*, 596 U.S. 482, 490–91 (2022) (citing *Davis v. Passman*, 442 U.S. 229 (1979) and *Carlson v. Green*, 446 U.S. 14 (1980)).  But since then, "the Court has not implied additional causes of action under the Constitution."  *Id.* at 491.  The Court has not "dispense[d] with *Bivens* altogether," but it has "emphasized that recognizing a cause of action under *Bivens* is 'a disfavored judicial activity.'"  *Id.* (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 135 (2017)).  It has instructed lower courts to use "caution" when a litigant argues a damages remedy is available under *Bivens*.  *Id.* (quoting *Hernandez v. Mesa*, 589 U.S. 93, 101 (2020)).

The inquiry in *Bivens* cases is normally framed as a two-step process.  *Id.* at 492.  First, the court must ask "whether the case presents 'a new *Bivens* context'—i.e., is it 'meaningfully' different from the three cases in which the Court has implied a damages action"?  *Id.* (alterations omitted) (quoting *Ziglar*, 582 U.S. at 139).  "Second, if a claim arises in a new context, a *Bivens* remedy is unavailable if there are 'special factors' indicating that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.'"  *Id.* (quoting *Ziglar*, 582 U.S. at 136).  "If there is even a single 'reason to pause before applying *Bivens* in a new context,' a court may not recognize a *Bivens* remedy."  *Id.* (quoting *Hernandez*, 589 U.S. .at 102).  But these two steps "often resolve into a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy."  *Id.*

23

Starting, with UMI's claim, the company argues the Ninth Circuit has already held that a *Bivens*-style damages remedy is available to compensate plaintiffs when a federal officer has made false statements against them, citing *Lanuza v. Love*, 899 F.3d 1019 (9th Cir. 2018). (*See* Doc. 29 at 10–11. The Ninth Circuit's opinion in *Lanuza* probably cannot be reconciled with the Supreme Court's intervening opinion in *Egbert*. In *Egbert*, the Supreme Court held that the Ninth Circuit's had erred in recognizing a *Bivens* remedy, even going so far as to describe the Circuit's analysis as "deeply flawed." 596 U.S. at 502. The Ninth Circuit had relied in turn on *Lanuza*. *See* 998 F.3d at 389 (quoting and citing 899 F.3d 1019). This later history has led some to conclude that *Lanuza* has been "implicitly overruled." *Sheikh v. U.S. Dep't of Homeland Sec.*, No. 22-00409, 2022 WL 16964105, at *5 (E.D. Cal. Nov. 16, 2022), *aff'd*, 106 F.4th 918 (9th Cir. 2024); *see also Sheikh*, 106 F.4th at 930–31 (R. Nelson, J., concurring) ("[T]he reasoning in *Lanuza* is impossible to defend post-*Egbert*.").

It is not necessary to decide whether *Lanuza* has been overruled, because even if it remains binding, the claims in this case arise "in a new context" for purposes of the two-step test summarized above. A case arises in a new context "if it 'is different in a meaningful way from previous *Bivens* cases'" decided by the Supreme Court itself, not from the decisions of any other lower courts. *Sheikh*, 106 F.4th at 924 (quoting *Abbasi*, 582 U.S. at 139); *see also id.* at 926 (declining to follow *Lanuza* for this reason). A claim that a federal officer has presented misleading or false evidence to a judge arises in a new and different context from *Bivens*, *Davis*, and *Carlson*; none of those cases concerned an officer's allegedly false or misleading statements to a magistrate judge. *See id.* at 925–26. This case also concerns the actions of agents working for a different administrative agency with a different "mandate" than the agencies whose officers were defendants in the Supreme Court's previous cases. *See id.* at 925.

Because UMI's claim arises in a "new" context, this Court must "ask if there are 'special factors indicating that the Judiciary is at least arguably less equipped than Congress to weigh the costs and benefits of allowing a damages action to proceed.'" *Id.* at 926 (quoting *Egbert*, 596 U.S. at 492). There is at least one: an alternative remedy is available. "[A] court may not fashion a *Bivens* remedy if Congress already has provided, or has authorized the Executive to provide, 'an

24

alternative remedial structure.'" *Egbert*, 596 U.S. at 493 (quoting *Ziglar*, 582 U.S. at 137).  As the government points out, the Federal Rules of Criminal Procedure permit a person "aggrieved by an unlawful search and seizure of property or by the deprivation of property [to] move for the property's return." (Doc. 28-1 at 11 (alteration in original) (quoting Fed. R. Crim. P. 41(g)). Federal regulations also authorize the Office of Internal Affairs of the Food and Drug Administration to take action on complaints against the agency's personnel.  *See id.* at 11 & n.1. For these reasons, no *Bivens* damages remedy is available to UMI in this case.

Mr. He's excessive force claim arises in a "new" context as well.  In *Egbert*, as in *Bivens*, the plaintiff alleged a federal officer had used excessive force.  596 U.S. at 490.  But the Supreme Court held nevertheless that the case arose in a new context—despite the plaintiff's "similar allegations of excessive force," "almost parallel circumstances," and "similar mechanism of injury."  *Mejia v. Miller*, 61 F.4th 663, 668 (9th Cir. 2023) (quoting *Egbert*, 596 U.S. at 495). Among other reasons, excessive force cases arise in a "new" context when the defendants are officers of a different federal agency with a different mandate and when they used force outside the plaintiff's home.  *See id.* at 668–69.  Mr. He's claims about actions by FDA special agents outside his home thus arise in a new context.  And because he has alternative remedies, such as an internal investigation and discipline, "special factors" counsel against extending him a damages remedy under *Bivens*.  *See id.* at 669.  Mr. He cannot pursue his *Bivens* claim.

Amendments to the complaint could not remedy the defects above.  The court therefore grants the Federal Defendants' motion to dismiss without leave to amend.  *See Sheikh*, 106 F.4th at 930 (affirming dismissal of *Bivens* claim without leave to amend in similar circumstances).

## CONCLUSION

For the reasons stated, the Court **ORDERS**:

1.      The County Defendants' motion to dismiss (Doc. 7) and the City Defendants' motion to dismiss (Doc. 9) are **GRANTED with leave to amend in part**: UMI may amend its first claim under 42 U.S.C. § 1983 within thirty days of the date this order is filed, but UMI may not amend claim two.

2.      The Federal Defendants' motion to dismiss (Doc. 28) is **GRANTED without**

**leave to amend**.

IT IS SO ORDERED.

    Dated:    **January 29, 2026**

_____
UNITED STATES DISTRICT JUDGE

26